[Cite as *State ex rel. Camaco, L.L.C. v. Albu*, 2014-Ohio-5330.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State ex rel. Camaco, LLC, :

      Relator, :

v. : No. 13AP-1002

Robert J. Albu and The Industrial : (REGULAR CALENDAR)
Commission of Ohio,
:
      Respondents.
:

---

D E C I S I O N

Rendered on December 2, 2014

---

*Davis & Young, Richard M. Garner* and *Sunny L. Horacek*, for relator.

*Bentoff & Duber Co., LPA,* and *Glen Richardson,* for respondent Robert J. Albu.

*Michael DeWine*, Attorney General, and *Kevin J. Reis*, for respondent Industrial Commission of Ohio.

---

IN MANDAMUS
ON OBJECTIONS TO MAGISTRATE'S DECISION

DORRIAN, J.

{¶ 1} Relator, Camaco, LLC ("relator"), filed this original action requesting a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order granting a violation of a specific safety requirement ("VSSR") award related to a workplace injury sustained by respondent Robert J. Albu ("claimant"), and ordering the commission to find that there was no VSSR.

{¶ 2}   Pursuant to Civ.R. 53(D) and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate who issued a decision, including findings of fact and conclusions of law, which is appended hereto. The magistrate recommends that this court deny the request for a writ of mandamus.

{¶ 3}   Relator sets forth two objections to the magistrate's decision:

> 1. The Magistrate incorrectly found that Albu was entitled to the VSSR Award where the undisputed evidence proves that Albu's injuries were caused by: (a) a hidden, latent design or manufacturing defect in the Wayne Trail 2; and/or (b) Albu knowingly and unilaterally bypassing safety devices for the Wayne Trail 2 that would have protected him from injury.
>
> 2. The Magistrate incorrectly found that Camaco waived the right to argue that Albu's injuries were caused by a hidden, latent design or manufacturing defect in the Wayne Trail 2.

{¶ 4}   As explained in the magistrate's decision, claimant was injured while correcting a malfunction in a system that used a Motoman robot to transfer pipes to a Wayne Trail 2 bending machine that bent the pipes to form frames for automobile seats. The system was contained inside a fenced area, or "cell." The cell could be accessed via two safety-interlocked doors that were designed to stop power to the Motoman robot and the Wayne Trail 2 bending machine when opened. On the day he was injured, claimant entered the cell to make adjustments to the Motoman robot through an opening in the perimeter fence that was intended to allow finished product to exit, rather than through the interlocked doors. In support of his VSSR claim, claimant offered a report from Vernon Mangold, Jr., an expert in the design and operation of robotic systems, who concluded that the emergency stop circuit on the system was improperly and defectively designed.

{¶ 5}   Following an initial order denying the VSSR claim, the commission granted claimant's request for rehearing, and a second staff hearing officer ("SHO") granted the award. The second SHO relied on the Mangold report and concluded that claimant's injury would have occurred even if claimant had entered the cell through the main door because of the defective stop circuit. The SHO further noted that "[Mangold] indicated that even the employees of Wayne Trail who trained the employees of the Employer were

not aware of this." (Second SHO Report, 2.) On review of relator's mandamus claim, the magistrate concluded that the Mangold report constituted some evidence on which the commission could rely in concluding that relator violated a safety requirement. The magistrate further concluded that relator waived the argument that a VSSR award was inappropriate because the accident resulted from a latent defect and that relator was unaware of the defect.

{¶ 6} We begin with relator's second objection, in which relator asserts that the magistrate incorrectly concluded that it waived the right to argue that the accident resulted from a latent defect. Generally, reviewing courts do not "consider an error which the complaining party 'could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court.' " *State ex rel. Quarto Mining Co. v. Foreman*, 79 Ohio St.3d 78, 81 (1997), quoting *State v. Williams*, 51 Ohio St.2d 112, 117 (1977). This principle has been applied in cases involving the commission and in cases seeking mandamus relief. *See Quarto Mining* at 81-82; *State ex rel. Gibson v. Indus. Comm.*, 39 Ohio St.3d 319, 320 (1988); *State ex rel. M.T.D. Prods., Inc. v. Stebbins*, 43 Ohio St.2d 114, 118 (1975).

{¶ 7} In *M.T.D. Prods.*, the claimant was injured while operating a plastic injection molding machine. *M.T.D. Prods.* at 114. The commission granted a VSSR award, concluding that the injury was caused by the lack of an effective guard on the machine. *Id.* at 117. On appeal, the Supreme Court of Ohio concluded that the machine in question had a safety gate that complied with the relevant safety requirements and that the safety gate had not malfunctioned prior to the claimant's injury. *Id.* at 117-18. The Supreme Court held that the commission abused its discretion in granting the VSSR award because a single failure of the safety gate was not sufficient to find that the regulation was violated. *Id.* at 118. In reaching its decision, the Supreme Court rejected the claimant's argument that the employer had notice that the machine was not operating properly because the claimant asserted this argument for the first time on appeal. *Id.*

{¶ 8} The present case presents a scenario similar to *M.T.D. Prods.* In this case, after the second SHO granted the VSSR award, relator filed a motion for rehearing. In the memorandum in support of its motion, relator argued that the Mangold report was inaccurate and that the expert reports and witness testimony that relator presented

contradicted the Mangold report. Relator claimed that the second SHO abused her discretion by failing to make a credibility determination with respect to the contradictory expert reports. However, in its motion for rehearing, relator did not argue that the accident resulted from a latent defect, nor that it lacked notice or knowledge of any defect in the system.[1] Relator could have offered this as an alternative basis for granting rehearing but failed to raise this issue before the commission.[2] Instead, relator asserted the argument for the first time in this court before the magistrate. The magistrate properly concluded that relator waived the issue by failing to assert it in the proceedings before the commission. We agree and reject relator's second objection that the magistrate erred by concluding that relator waived the latent-defect argument.

{¶ 9} As an alternative, relator asserts that, even if the latent-defect argument was waived, the commission's grant of the VSSR award constitutes plain error. In a civil proceeding, "plain error involves those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a material, adverse effect on the character of and public confidence in, judicial proceedings." *In re Moore*, 10th Dist. No. 04AP-299, 2005-Ohio-747, ¶ 8, citing *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 122 (1997). Reviewing courts must proceed with "the utmost caution" in applying the doctrine of plain error in civil cases. *Goldfuss* at 121. We are unaware of any case in which the plain-error doctrine has been applied to overrule a commission decision granting a VSSR award, and relator fails to cite any such decision. Relator argues that it would be unjust to impose VSSR liability when the accident was the result of a latent defect. However, although relator states in its objections that the second SHO found that claimant's circumvention of the safety feature did not cause the accident "because there was a

---

[1] In its motion for rehearing, relator quoted portions of the second SHO's report and highlighted in particular the following: "Mr. Mangold indicated that it was not possible for the Injured Worker to enter the enclosure and then turn on power only to the robot by means of the teach pendant. Mr. Mangold states that the transfer arm of the bending machine was capable of moving at full speed when the robot was in teach mode." (Motion for Rehearing, 2.) Relator then inserted ellipses in lieu of the following sentence from the second SHO's report: "[Mangold] indicated that even the employees of Wayne Trail who trained the employees of the Employer were not aware of this." It is the latter sentence which relator now highlights on appeal.

[2] Relator filed a "Motion to Vacate and to Reinstate Motion for Rehearing" after the commission denied its motion for rehearing. Therein, relator raised only technical/procedural issues but did not raise the issue of latent defect.

hidden, latent defect in Wayne Trail 2, *that neither Albu nor Camaco knew of*" that allowed the transfer arm to continue to operate in teach mode, careful reading of the SHO's finding belies relator's statement. (Emphasis added.) (Objections, 7.) While the SHO did find that the transfer arm was capable of moving at full speed in teach mode, she noted that Mangold indicated that "*the employees of Wayne Trail* who trained the employees of the Employer were not aware of this." (Emphasis added.) (Second SHO Report, 2.) Relator argues this necessarily means that relator could not have been aware of it. We do not agree. Contrary to relator's assertion, the SHO did not find that relator was unaware of the defect.[3] Furthermore, relator points us to no evidence in support of its argument that it was unaware. Under these circumstances, we conclude that this is not one of those rare cases where the plain-error doctrine must be applied to prevent a manifest miscarriage of justice.

{¶ 10} Accordingly, relator's second objection to the magistrate's decision lacks merit and is overruled.

{¶ 11} In relator's first objection, it argues that the magistrate erred by finding that claimant was entitled to the VSSR award because his injuries were caused by a latent defect in the system and because claimant unilaterally bypassed safety devices that would have protected him from injury. With respect to the first argument, that claimant's injuries were caused by a latent defect, as explained above, relator waived this argument by failing to assert it before the commission. With respect to the second argument, that claimant unilaterally bypassed safety devices by entering the enclosure through an exit chute rather than the main door, the second SHO rejected this argument. Relying on the Mangold report, the second SHO concluded the injury would have occurred even if claimant had entered through the main door. The magistrate properly concluded that the Mangold report constituted some evidence on which the commission could rely in granting the VSSR award.

{¶ 12} Accordingly, relator's first objection to the magistrate's decision lacks merit and is overruled.

---

[3] Here, we note as well that there was evidence presented to the commission indicating that, prior to claimant's accident, another employee was nearly struck when performing a similar task and that one employee spoke with relator's maintenance supervisor about modifying the system to avoid the risk of injury. *See* Sheppard Depo., Stipulated Evidence at 254, 260-61.

{¶ 13} Upon review of the magistrate's decision, an independent review of the record, and due consideration of relator's objections, we find that the magistrate has properly determined the pertinent facts and applied the appropriate law. We therefore overrule relator's two objections to the magistrate's decision and adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. Accordingly, the requested writ of mandamus is hereby denied.

*Objections overruled; writ denied.*

TYACK and KLATT, JJ., concur.

_____

# APPENDIX

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Camaco, LLC, | : | |
| Relator, | : | |
| v. | : | No. 13AP-1002 |
| Robert J. Albu and The Industrial Commission of Ohio, | : | (REGULAR CALENDAR) |
| | : | |
| Respondents. | : | |
| | : | |

---

## MAGISTRATE'S DECISION

### Rendered on May 29, 2014

---

*Davis & Young, Richard M. Garner* and *Sunny L. Horacek,* for relator.

*Bentoff & Duber Co., LPA,* and *Glen Richardson,* for respondent Robert J. Albu.

*Michael DeWine,* Attorney General, and *Kevin J. Reis,* for respondent Industrial Commission of Ohio.

---

### IN MANDAMUS

{¶ 14} Relator, Camaco, LLC ("relator" or "Camaco"), has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order finding that relator violated a

specific safety requirement ("VSSR") relative to the work-related injury sustained by Robert J. Albu ("claimant"), and ordering the commission to find that there was no VSSR.

Findings of Fact:

{¶ 15} 1. Claimant sustained a work-related injury on January 31, 2006 when he was struck in the head by the transfer arm of a Wayne Trail 2 bending machine and then struck his head on a pipe. Claimant's workers' compensation claim has been allowed for the following conditions:

> Open skull/other fracture-brief coma; encephalocele; fracture condyle process mandible-closed; contusion, face; cortex contusion-brief coma; ankylosis left ear ossicles; orbit deformity due to trauma-right; open wound face complicated; open wound external left ear; open wound scalp-complicated; traumatic brain injury; subdural hemorrhage; brain conditions; nonpsychotic brain syndrome; brief depressive reaction; conductive hear loss tympanic membrane, left ear; cervical syndrome.

{¶ 16} 2. There is no real dispute by the parties concerning how claimant's injuries occurred. Claimant was employed as a weld technician by Camaco, which manufactures automotive parts. The machine in question was a Wayne Trail 2 bending machine that bent pipes to form frames for automobile seats. In the same area, a Motoman robot would transfer pipes to the bending machine to accomplish this task. The job of the weld tech is to alter the program on the robot (teach the robot) to adjust for a weld operation.

{¶ 17} At the time of the accident, the Wayne Trail 2 was being operated by Ollie Higgins—another Camaco employee. After Higgins changed parts during production, the robot picked up a part and moved it to another station, but then the entire process abruptly halted—presumably because it did not trip the sensor for the machine to keep running. Claimant was called to troubleshoot the problem.

{¶ 18} Claimant's job as a weld-tech required him to correct malfunctions (troubleshoot) inside a fenced area or cell that contained the Wayne Trail 2 bending machine and a robot called a Motoman. On the day in question, claimant was called to resolve a jam that had occurred inside the cell when the transfer process between the Motoman and the Wayne Trail 2 malfunctioned. In order to troubleshoot or diagnose the problem, claimant could either be inside or outside the enclosed fenced area.

{¶ 19} On the day of injury, claimant was not able to see the problem area from outside the fenced area and needed to go inside the fenced area. Claimant did not gain access through the interlock doors. Claimant testified that he crawled through the gap between the machine and the fence where the machine's discharge or exit chute delivers the finished part. Entering the fenced area through the exit ramp chute does not shut down electricity to the Wayne Trail 2 or the Motoman robot.

{¶ 20} When claimant entered the cell with the power on, he attempted to adjust the Motoman robot using the teach pendant. He apparently made an adjustment and the transfer arm from the Wayne Trail 2 moved and struck him in the head, driving his head into a pipe that was in the machine. This incident resulted in serious injuries to claimant.

{¶ 21} 3. On April 27, 2007, claimant filed an application for an additional award for a VSSR under Ohio Adm.Code section 4123:1-5-17(G) alleging that relator failed to provide suitable protective headgear where his work activity exposed his head to potential physical contact with rigid objects.

{¶ 22} 4. The Ohio Bureau of Workers' Compensation Safety Violations Investigation Unit conducted an investigation to determine whether claimant's injury was caused by relator's violation of a VSSR. The March 26, 2008 report is contained in the stipulation of evidence; however, the investigators did not reach a conclusion, and, instead, stated:

> There are conflicting statements about why Robert Albu entered into the wire-mesh fencing area of the machine. Robert Albu states in his sworn affidavit he was trained by Roland Sheppard, an experienced Weld Tech, to climb through the material exit opening of the fencing in order to program the Motoman robot (Exhibit 1). The employer states Robert Albu would have not received any injuries had he used the Motoman Teach Pendant properly and programmed the Motoman robot from outside the wire-mesh fencing. Also, the employer states Robert Albu would not have received any injuries had he not bypassed the machine's safety features, the man-door interlocks, and entered the wire-mesh fencing through the material exit opening in the fencing.

(Emphasis sic.)

{¶ 23} 5. While acknowledging that this will be a very simplistic description of how these machines work, the magistrate notes these basic facts. Two machines were involved here: the Wayne Trail 2 is used to bend metal tubing to form seat frames for automobiles and it uses a Motoman robot to move bent frame tubes to different molds during the manufacturing process. The machines are fully automated and are surrounded by a perimeter fence to keep workers safe and away from the machines. There are two safety-interlocked doors which are designed to de-energize both machines when opened.

{¶ 24} Claimant was employed by relator as a weld tech trainee and his duties included troubleshooting robotic problems with some of the automated machines used by relator including the Wayne Trail 2 and its Motoman robot. Employees such as claimant used a "teach pendant" to re-program the Motoman robot. The teach pendant is supposed to control the Motoman robot at a slow speed while the Wayne Trail 2 is de-energized.

{¶ 25} 6. At the hearings before the commission, relator's argument focused on the fact that it was undisputed that claimant gained access to the area inside the perimeter fence through an opening in the fence and did not utilize the safety doors. In this regard, relator asserts that if claimant would have entered the area through the safety doors, power to the machines would have been off, and claimant would not have sustained his injuries.

{¶ 26} In response, claimant admitted that he gained access to the machine through an opening in the perimeter fencing and that he had been taught this method. Claimant also acknowledged that opening the safety doors would shut off power to both the Wayne Trail 2 and the Motoman robot. Claimant also indicated that it was necessary to have power turned on to both machines in order to troubleshoot the problems and use the teach pendant to alter the Motoman robot's actions. Because both machines needed to be energized, the opening in the perimeter fence was utilized by employees so that the machines would not need to be de-energized and then re-energized since that took time.

{¶ 27} 7. Three different experts prepared reports relative to ongoing litigation. The magistrate has reviewed all three reports and below has noted salient findings and opinions of those three experts which are relevant to the issues raised here.

{¶ 28} (a) At the outset of his September 15, 2009 report, Steven Kramer, Ph.D., stated:

> At issue is the fence surrounding the work cell. The salient questions about the fence are: [1] Is it strong enough? [2] Is it large enough or too large? and [3] Does it do what it is supposed to do? The answers are: [1] yes, the fence is strong enough in that someone cannot break through and enter the work cell. [2] the work cell was made larger than it should have been in the area where workers needed to view the robot gripper in order to make adjustments.
>
> To question number three; does it do what it is supposed to do? The answer is yes and no. Yes to the portion of the fence with the two interlocking gates because when either is opened, the electrical, hydraulic and pneumatic power are shut down and therefore all motion of the robot and other equipment in the work cell stops. In depositions taken in May 2009, it was stated by Wayne Trail [hereafter noted as WT], that the robot will operate in teach mode with the interlocking gate open. However, this was not adequately, if at all, conveyed to Camaco since Mr. Albu and other Camaco employees did not know of this feature. Back to question three: The part of the answer which is No pertains to the portion of the fence where the parts exit the work cell in what has been called the exit opening or exit chute.
>
> At the time of the accident the portion of the fence where the bent tubes exited the work cell consisted of an <u>opening that was 32 inches high by 71 inches wide</u> starting at a height of 21 inches above the floor.
>
> This opening was much larger than needed. * * * Had the opening been sized to allow only the bent tubes to exit the work cell, this accident would not have occurred.
>
> Camaco had safety walks throughout the plant by members of their safety committee every other week. It is unfortunate that no one on this committee identified this large opening as a potential problem. The RIA Standard says: "Safeguarding devices [in this case, the safety fence] shall be designed, constructed, attached and maintained to ensure that personnel cannot reach over, under, around, or through the device undetected and reach the hazard." More simply, the same standard in section 11.1 says: "Barrier guards, fixed and interlocked, shall prevent access to a hazard." In my

opinion, the safety committee should have identified this large opening as a potential problem and made the opening smaller. Had they done this, the accident would not have occurred.

Someone designing this safety fence as well as someone in charge of safety at this company should have known that employees at some point would climb through such an opening as a shortcut. The safety standards for robotics and moving machinery accept as a predicate that workers will either inadvertently, or intentionally, obtain access to machinery that is guarded by an inadequate fixed barrier guard. Why? Sometimes workers try to cut corners, sometimes they are pressured to keeping production running while needing to fix a jam-up, or sometimes they think they can make an adjustment on-the-fly in the work cell. The safety standards accept this as a premise in the design of the machinery and safety devices. Thus, the design of this machinery and safety fence were a proximate cause in this accident.

* * *

There is another issue regarding the design of the work cell. That is, the equipment that gripped the tubes was positioned inside the work cell such that they could not be adequately seen from outside the work cell. On page 102 and 103 of Mr. Curtis Taylor's deposition, Mr. Taylor says Mr. Albu couldn't have made the adjustment from outside "because you have a big post in your way when you're looking at it from the backside of the machine....it's so far away and up so high you can't see the die itself...and you have the second flattening station that are all in your line of sight to be able to see exactly what you had to do to lay that part down." Consequently weld techs needed to enter the work cell to get a better look in order to make any needed adjustments. Also Mr. Roland Sheppard stated in his deposition that weld techs who were positioned outside the work cell said they could not adequately see how the tubes were being gripped in the clamping devices. Consequently weld techs had to enter the work cell to get a closer look in order to troubleshoot and touch-up [their word for adjust] a pickup or drop-off point. They indicated they needed the power kept on in order to make the proper adjustment. Mr. Taylor said [page 97] "now...after the accident, we don't run that side. We run the other side where everything is easy to see, its right in front of

you up close, you know. You can adjust any problem as far as the robot goes, you can adjust from outside."

Having personally seen the work cell on February 10, 2009 I can corroborate that the clamping devices were too far from the fence to be adequately viewed from outside the work cell. If the clamping devices would have been positioned closer to any portion of the fence, or the fence positioned closer to where the pickup and drop-off positions were, touch-up could have been accomplished using the pendant from outside the work cell. From a design standpoint, it was entirely feasible to reposition the clamping devices, benders, robot, fence and transfer mechanisms, just as done on the other side of this work cell. Had the work cell been so designed, there would have been no need to enter the work cell with it powered up.

In order to adequately troubleshoot the manufacturing line [and hence adjust a drop-off or pickup point] a weld tech or other suitably trained person needed to be inside the work cell with the power turned on and the robot in teach mode. Camaco did not have a policy about entering the work cell. The policy they did have concerning not dismantling or overriding or tampering guarding [Exhibit 8] was ambiguous because it was interpreted by weld techs to not apply to troubleshooting as well as not prohibiting entering the work cell through the unguarded exit opening.

In April and May you sent me the following depositions for my review: Stephanie Fox, William Hamby Jr., Ollie Higgins, Alfred Horton III, David Maysonet, Patrick Schwartz, Roland Sheppard, Curtis Taylor, Jonathan Wright and of course Robert Albu in January 2009. In June you sent me depositions for review of: Matthew Brown, Danny Haid, Kevin Greiner, Chris May, Robert Mayse, Scott McCabe, and Mark Swob. Although your safety expert, Mr. Rennell, will likely comment on safety issues discussed in these depositions, I noted the following points in the deposition of Mr. Roland Sheppard. Mr. Sheppard stated...and I'm paraphrasing:

[One] The work cell did not have any sort of physical safety device preventing or stopping people from entering it through the parts exit opening which was large enough for a grown man to fit through it rather easily.

[Two] The company put production numbers ahead of safety. They cared about production numbers and getting parts out; that's why their quality lagged. They make it an emphasis to get the equipment or the work cell back up and running as quickly as possible.

[Three] Several weld techs were inside of the WT2 work cell while it was powered up and the company knew this.

[Four] Dave Maysonet almost had a near miss on this line some time before Albu's accident.

[Five] Maintenance supervisor, Bill Hamby, Jr. said he would look into trying to figure out a way for us to be able to be in the work cell without all of this other stuff going on.

Mr. Taylor also detailed that several weld techs including himself entered the work cell through the exit opening in order to troubleshoot and adjust the robot pickup and drop-off points. He provided an accurate description of the power to the robot and other equipment and how the sensors sent signals to these devices. He indicated it was the WT guys who showed Camaco employees how to go into the work cell when necessary [page 32]. It appears that it was common practice at Camaco for weld techs to enter the work cell when the power was on in order to fix a problem that might have occurred. In my opinion, this clearly violates good safety principles in the workplace since injury was substantially certain to occur.

* * *

In the WT2 work cell at Camaco it appears the robot can move in teach mode while the interlock barrier gate is open. This in itself is not a violation of RIA or OSHA. However, it is not known if the speed of 10 inches/second [for safety, no doubt] was maintained in troubleshooting mode.

(Emphasis sic.)

(b) In his October 14, 2009 report, Tarald O. Kvalseth, Ph.D., noted:

The opening through the fence was unnecessarily large and could easily and foreseeably be used by an individual to enter the cell to perform maintenance work or troubleshooting instead of going through an interlocked gate. Entering through that opening could certainly and foreseeably be

perceived by an individual as being more efficient than going through an interlocked gate, which would shut down the power to the equipment.

* * *

Camaco had not provided Robert Albu with sufficient training for him to perform the type of maintenance and troubleshooting that he was doing at the time of his injury. It seems clear from his and other depositions that he was not sufficiently qualified to do this work by himself.

* * *

The unsafe act by Robert Albu involved entering the enclosure through the fence opening rather than using the electrically interlocked gate, which would have de-energized the equipment. However, he apparently did it as he had observed others do it. He did not act contrary to any instructions he had been provided with. He believed that he needed power to the equipment in order to properly perform his task, which could be achieved efficiently by going through the fence opening. He did not act contrary to any warning sign informing or reminding him that this fence opening should not be used to enter the enclosure since none was provided.

(c) The November 30, 2009 report of Vernon Mangold, Jr., who stated:

At the time that WTT designed, fabricated and installed the system at Camaco they did not have a thorough understanding of the operation and function of the Motoman controller. In layman's language: their recommended fault recovery process was incorrect and potentially lethal.

In several of the depositions WTT personnel erroneously state that Mr. Albu's incident could not have happened if he entered the work cell via the main entrance gate. They assert that entering through the gate would have placed the system in a hold mode and the robot would be placed in teach mode to allow Albu to correct the type of machine fault that he observed at the dimple press. They have emphatically stated that the transfer device could not have injured Albu while he was standing in the danger zone of the dimple press with the robot teach pendant in hand and the robot in teach mode.

Simply put: Conventional robots that have been marketed and sold in the US since 1992 are equipped with sophisticated safety control devices known as teach pendants. Modern teach pendants are equipped with a mid-position enable switch that must be properly depressed to cause the robot to move exclusively by means of teach pendant control. The robot is restricted in its movement so that it cannot travel any faster than what is described as slow speed during teach mode. This control feature is useful but is specific to the robot only.

It can be proven that the robot did not strike anyone. However, the transfer device that did strike Mr. Albu was, at the time of the incident, capable of moving at full speed while the robot is in tech mode. How is this possible? Robot control interfaces have a factory installed feature that allows a person to, in the parlance of the industry, "Force an Output On" from the teach pendant with the robot in the teach mode.

It is incorrect to assert that Albu would have been safe with the robot in teach mode. WTT designed and built a PLC control system that allowed for a custom robotic device, in this case the overhead transfer mechanism that struck Albu, and a vertical hydraulic dimple press, to operate independently of the robot machine control.

* * *

Emergency stop circuit was improperly and defectively designed because the robot teach pendant emergency-stop is not designed to emergency-stop all equipment within work cell that can produce safety hazards to personnel. WTT failed to provide a proper emergency stop control scheme integrating emergency stop controls in a coherent electrical design that complies with ANSI single point of control requirements. Thus, the functioning of the robot teach pendant emergency stop control and the interaction of the control feature with other capital equipment system elements present in the integrated system was not properly designed. In the event that the emergency-stop circuit had been properly designed, then the use of the e-stop control on the teach pendant could have prevented Mr. Albu's incident from occurring. The risks of this emergency stop circuit design outweigh any conceivable benefit.

* * *

At the time WTT designed, fabricated and installed this industrial robot system at Camaco they (WTT) did not have a thorough understanding of the operation and function of the Motorman controller. WTT's recommended fault recovery process was incorrect, hazardous, defective and potentially lethal. The transfer device that did strike Mr. Albu was capable of moving at full speed even if the robot was in teach mode and even if Mr. Albu entered the work cell through the interlocked gate. As a result, it is incorrect to claim that Mr. Albu would have been safe with the robot in teach mode because the program logic control (PLC) control [sic] system that WTT designed and built allowed for the subject overhead transfer mechanism and the vertical hydraulic dimple press to operate independently of the robot machine control.

{¶ 29} 8. Claimant's application was heard before a staff hearing officer ("SHO") on December 19, 2012. The SHO determined that claimant was not entitled to an additional award for a VSSR solely because he circumvented the machine's safety features. Specifically, the SHO stated:

The Staff Hearing Officer finds that, but for Mr. Albu's intentional act in circumventing the safety features (limit switch equipped man doors) protecting the cell, the Wayne Trail machine would not have been energized at the time during which Mr. Albu was within the cell and that, consequently, his injury would not have taken place. The question of whether or not head protection was required or whether or not there was a violation of O.A.C. 4123:1-5-17(G) is not pertinent in the present scenario as there would have been no potential for a head injury to occur, in the manner sustained by Mr. Albu, had the personnel doors been used by Mr. Albu and the cell de-energized.

For all the foregoing reasons, the IC-8 application is denied. All evidence on file and at hearing, including the 12/18/2012 report of Dr. Vargo, the 12/17/2008 deposition of Robert Albu, the 04/16/2009 deposition of Roland Sheppard, the 04/15/2009 deposition of Jonathan V. Wright and the 04/15/2009 deposition of Alfred F. Horton, was reviewed and considered.

{¶ 30} 9. Claimant filed a motion for rehearing.

{¶ 31} 10. In an order mailed March 20, 2013, an SHO granted claimant's motion, stating:

> It is the order of the Industrial Commission that the Motion for Rehearing be granted for the reason that the Injured Worker has demonstrated that the order issued 01/26/2013 was bas[ed] on a clear mistake of law in accordance with Ohio Administrative Code 4121-3-20(E)(1)(b).
>
> The Injured Worker's counsel sites [sic] to evidence in the rehearing request that indicates the Injured Worker had to be inside the cell with the power to the machine on in order to trouble shoot and fix the Motoman that was not working. He also cites evidence indicating the Motoman and the Wayne Trail machine were interconnected power wise and that the power could not be turned on or off to each separately. The Staff Hearing Order fails to address these issues and fails to cite any evidence to indicate the Injured Worker did not need to be inside the cell with the power on to the Motoman, and thus also to the Wayne Trail machine, in order to trouble shoot and fix the Motoman. The Employer's rebuttal memo to the rehearing request fails to cite any evidence that contradicts what is noted by the Injured Worker's counsel.
>
> If the evidence sited [sic] by the Injured Worker's counsel is correct, then the intentional circumvention of the doors that automatically shut off the power is immaterial as the power would have to have been turned back on once the Injured Worker was inside the cell so he could perform the required trouble shooting even if he had used the doors. The intentional circumvention of the safety feature is only a bar to an award if the injury would not have occurred had the circumvention not occurred. In this case the order fails to explain why the Injured Worker's argument is not correct that the injury would have occurred despite the circumvention of the safety feature of the doors since the power had to be on once the Injured Worker was in the cell. Since the Staff Hearing Order fails to address this issue and site [sic] evidence indicating the power did not need to be turned on once the Injured Worker was in the cell whether he used the doors to enter or not, or that the Wayne Trail could be turned off without the Motoman being turned off, it is found the order is not legally sufficient pursuant to [*State ex rel. Mitchell v. Robbins & Myers, Inc.*, 6 Ohio St.3d 481 (1983)].

> Further, since the order found no violation solely because of the Injured Worker's circumvention of the safety feature associated with the doors, the order does not address whether head protection would have been required by the rule once the Injured Worker was inside the cell with the power back on if such was in fact required to perform the trouble shooting.

(Emphasis added.)

{¶ 32} 11. The matter was reheard before a second SHO on June 26, 2013. The SHO concluded that claimant was entitled to an additional award for a VSSR, stating:

> It is the order of the Staff Hearing Officer that the Injured Worker was employed on the date of injury noted above, by the Employer as a weld technician; that the Injured Worker sustained an injury in the course of and arising out of employment when he was struck in the head by a transfer arm from a Wayne Trail bending machine and then struck his head on a pipe.
>
> At the time of the injury the Injured Worker had been assigned to correct a malfunction in a fenced in area that contained a Motoman robot and the Wayne Trail bending machine. Under normal circumstances the robot transferred pipes to the bending machine where they would be formed into frames for automobile seating. On the day in question the transfer process had malfunctioned and the bending machine was not accepting the transfer of a pipe. The Injured Worker was called in to correct the situation. He stated that he needed to enter the enclosure to make the repair as he could not see the area of the problem from outside the enclosure.
>
> The fenced in area was designed so that when a person entered the enclosure through a door power was cut off to both the robot and the bending machine. At the time of the injury the Injured Worker did not enter the fenced in area through a door. He, rather, climbed into the enclosure through an opening that was designed to permit finished product to leave the enclosure. The Injured Worker testified that he had observed other employees enter the enclosure in this way prior to the date of the injury and that he did so as he did not want to cut off power to the bending machine as he did not know how to restart it. Prior to entering the

enclosure the Injured Worker picked up a hand held device called a teach pendant and shut off the power to the robot. He then slid the teach pendant under the bottom of the enclosure and entered the fenced in area. He does not remember any of the events following this until a point after which the injur[y] had occurred. The evidence indicates that the Injured Worker attempted to adjust the robot using the teach pendant and the transfer arm of the bending machine moved and struck the Injured Worker in the head. He was then thrown into the pipe that was in the machine.

The Injured Worker has requested a finding that his injury was the result of the Employer's violation of Section 4123:1-5-17(G) of the Ohio Administrate Code. This section requires an Employer to provide an employee with suitable protective headgear where his work activity exposes him to potential hazards from falling or flying objects or where there is the potential of physical contact to the head from rigid objects. There is no evidence that the Injured Worker's employment presented him with potential hazards from falling or flying objects. The issue is whether his employment presented a potential hazard of contact with rigid objects.

The Employer has asserted that the work activity presented no potential hazard of contact with rigid objects. It states that the Injured Worker bypassed a safety device when he failed to enter the enclosure through a door thereby shutting off all power. The Employer argued that, if he had entered through a door, the Injured Worker could have used the teach pendant to repair the robot by using the teach pendant to turn on power only to the robot and then make the repair when the robot was in teach mode. After the repair was made, the Injured Worker would have exited the enclosure and then turned on power to all of the machinery.

There is no doubt that the Injured Worker bypassed a safety device when he entered the enclosure through means other than the main door. The Hearing Officer, however, finds that the injury would have occurred even if the Injured Worker had gone into the enclosure through the main door. The file contains a report from Vernon Mangold, an expert in the design and operation of robotic systems. Mr. Mangold indicated that it was not possible for the Injured Worker to enter the enclosure and then turn on power only to the robot by means of the teach pendant. Mr. Mangold states that the transfer arm of the bending machine was capable of moving

at full speed when the robot was in teach mode. He indicated that even the employees of Wayne Trail who trained the employees of the Employer were not aware of this.

The Hearing Officer finds that the Injured Worker's employer did present a potential hazard of head contact with rigid objects as the system did not permit power to be turned off to the bending machine when power to the robot was activated. The Employer, therefore, should have provided head protection to the Injured Worker. Had the Employer done so the injury might not have occurred or might have been much less serious.

It is therefore ordered that an additional award of compensation be granted to the Injured Worker in the amount of thirty-five percent of the maximum weekly rate under the rule of State ex rel. Engle v. Indus. Comm. (1944), 142 Ohio St. 425.

{¶ 33} 12. Relator filed requests for reconsideration and rehearing and argued that the Mangold report could not be relied on because it was contradicted by all the other evidence submitted. Further, relator asserted that the SHO failed to explain why the Mangold report was found to be persuasive.

{¶ 34} 13. Relator's requests for reconsideration and rehearing were denied by orders of the commission mailed September 5 and 26, 2013.

{¶ 35} 14. Thereafter, relator filed the instant mandamus action in this court.

Conclusions of Law:

{¶ 36} For the reasons that follow, it is this magistrate's decision that relator has not demonstrated that the commission abused its discretion by granting claimant an additional award for a VSSR and this court should deny relator's request for a writ of mandamus.

{¶ 37} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967). A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record. *State ex rel.*

*Elliott v. Indus. Comm.*, 26 Ohio St.3d 76 (1986). On the other hand, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. *State ex rel. Lewis v. Diamond Foundry Co.*, 29 Ohio St.3d 56 (1987). Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. *State ex rel. Teece v. Indus. Comm.*, 68 Ohio St.2d 165 (1981).

{¶ 38} In regard to an application for an additional award for a VSSR, the claimant must establish that an applicable and specific safety requirement exists, which was in effect at the time of the injury, that the employer failed to comply with the requirement, and the failure to comply was the cause of the injury in question. *State ex rel. Trydle v. Indus. Comm.*, 32 Ohio St.2d 257 (1972). The interpretation of a specific safety requirement is within the final jurisdiction of the commission. *State ex rel. Berry v. Indus. Comm.*, 4 Ohio St.3d 193 (1983). Because a VSSR award is a penalty, however, it must be strictly construed, and all reasonable doubts concerning the interpretation of the safety standard are to be construed against its applicability to the employer. *State ex rel. Burton v. Indus. Comm.*, 46 Ohio St.3d 170 (1989). The question of whether an injury was caused by an employer's failure to satisfy a specific safety requirement is a question of fact to be decided by the commission subject only to the abuse of discretion tests. *Trydle*; *State ex rel. A-F Industries v. Indus. Comm.*, 26 Ohio St.3d 136 (1986); and *State ex rel. Ish v. Indus. Comm.*, 19 Ohio St.3d 28 (1985).

{¶ 39} Relator raises some new arguments in this mandamus action which were never made to the commission. The only issue challenged below was whether or not the cited report of Mr. Mangold constituted some evidence upon which the commission could rely to find a VSSR. Relator argued before the commission and continues to argue that Mangold's report is contrary to the reports of Drs. Kramer and Kvalseth, as well as the testimony of Stephanie Fox, and the commission was required to explain the reason why. At this time, relator also contends that the Wayne Trail 2 had a design defect and because of that defect, relator could not be held responsible for claimant's injuries.

{¶ 40} Ohio Adm.Code 4123:1-5-17 provides, in pertinent part:

> Personal protective equipment

* * *

(G) Head and hair protection.

(1) Responsibility.

(a) Employer.

(i) Whenever employees are required to be present where the potential hazards to their head exists from falling or flying objects, or from physical contact with rigid objects, or from exposures where there is a risk of injury from electric shock, employers shall provide employees with suitable protective headgear.

{¶ 41} First, to the extent that relator argues that a VSSR is inappropriate because the Wayne Trail 2 had a latent defect, which relator did not know, relator failed to raise this issue when the matter was still before the commission. Ordinarily reviewing courts do not have to consider an error which the complaining party could have called, but did not call, to the lower tribunal is attention at a time when it could have been avoided or corrected. *State ex rel. Quarto Mining Co. v. Foreman*, 79 Ohio St.3d 78 (1997). These principles also apply to cases reviewed in mandamus. *State ex rel. Gibson v. Indus. Comm.*, 39 Ohio St.3d 319, 320 (1988).

{¶ 42} Relator asserts that it is immaterial that it did not raise this issue because the SHO made it an issue which this court must now consider in this mandamus action. However, the magistrate notes that relator could have raised this issue when it sought review of the June 26, 2013 SHO order; however, relator did not. Relator asserts the SHO made contradictory findings which negate any VSSR penalty. Relator asserts the SHO specifically found that, because of the latent defect, relator could not have known claimant's injuries could have occurred. However, relator still failed to raise this argument at a time when the commission could have considered it and the magistrate does not find it appropriate for this court to consider the potential implications of the SHO's statements.

{¶ 43} Turning now to the finding of a VSSR, relator first argues that there were no potential hazards from physical contact with rigid objects when employees were outside the perimeter fencing. This was never an issue. The danger to employees arose because it

was impractical, if not impossible, to troubleshoot this machine from outside the perimeter fence. There is evidence in the record indicating that the preferred way to troubleshoot these machine was from outside the perimeter fence. As a result, when troubleshooting was required, employees needed to enter inside the perimeter fence. The safety-interlocked gates were designed to shut off power to both of the machines in the event that an employee needed access. However, there is evidence that the teach pendant did not work on the Motoman robot if the power to both machines was shut off. Further, there was a large opening in the perimeter fence used by employees to bypass the safety-interlocked gates to gain access to the machine. There is also evidence that relator knew employees utilized this opening to gain access to the machine and warning signs were posted by the opening. This information is contained within the Mangold report and is corroborated in the other reports as well as deposition testimony from various employees.

{¶ 44} Relator also argues that the finding of a VSSR here is improper because claimant deliberately circumvented the machine's safety features and cites *State ex rel. Quality Tower Serv., Inc. v. Indus. Comm.*, 88 Ohio St.3d 190 (2000). This was never disputed by any of the parties. However, the SHO relied on evidence that even if claimant would have entered the area via the opening, the injury would have occurred. Given this finding, relator's argument fails.

{¶ 45} Although relator challenged the Mangold report in its motion for rehearing, relator does not challenge that report here. Relator only argues that there cannot be a VSSR finding when the injuries were caused by a latent defect about which relator was unaware. As such, the magistrate finds the Mangold report does constitute some evidence upon which the commission could rely to find that even if claimant would have entered through the perimeter fence by way of the safety-interlocked doors, the transfer arm would have been capable of moving at full speed when the robot was in teach mode. As noted previously, the other arguments relator makes here, that the machine was defective, and this was a first time accident cannot be raised, for the first time, in this mandamus action. Relator failed to raise those arguments before the commission.

{¶ 46} Based on the foregoing, it is this magistrate's decision that relator has not demonstrated that the commission abused its discretion when it found that relator had

violated a specific safety requirement in making that award to claimant, and this court should deny relator's request for mandamus.

/S/ MAGISTRATE
STEPHANIE BISCA BROOKS

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).